C. Van Dyck Hubbard *v.* Henry Macfarlane.

SUPREME COURT—IN BANCO.

APRIL TERM—1878.

*Harris, C. J., McCully, J., (Judd, J., dissenting).*

C. VAN DYCK HUBBARD *vs.* HENRY MACFARLANE.

ON EXCEPTIONS.

THE DEFENDANT RECEIVED from one Christie three diamond shirt studs as security for his draft on the plaintiff of $575, which the plaintiff paid. The day he received the diamonds the defendant wrote the plaintiff in California as follows: "Christie having been pushed for money on his departure, I have taken his draft on you for $575, and hold as security his diamonds, which are sealed up and addressed to you, and as soon as the draft is paid I will forward the package to you through Wells, Fargo & Co.'s Express."

The package was not sent. Twenty-six months after the defendant delivered the diamonds to Christie personally at Honolulu. Over three years after the plaintiff, never having demanded the diamonds, sued in trover, claiming the amount of the draft he had paid.

HELD (JUDD, J, dissenting), that it was properly left to the jury to find whether the defendant was liable under the circumstances.

Opinion of a majority of the Court by HARRIS, C. J.

This is entitled an action of trover, in which it was alleged

C. Van Dyck Hubbard *v.* Henry Macfarlane.

that the defendant had converted to his own use a packet of diamonds, consisting of three studs, one ring and other articles, of the value in the whole of $2,500.

At the hearing the following statement was made by counsel for the plaintiff: That, although in the declaration, the sum claimed was $2,500, from the testimony taken in the morning (at the bedside of Mr. Christie, then very sick) to be used at the trial, he could only claim the sum of $600.

The plaintiff put in the evidence of Mr. Christie, which is as follows: "I left three diamond studs with Henry Macfarlane; they were shirt studs. About the 11th of November I left them with him; they were left to secure Mr. Macfarlane on a draft of about $575. I don't recollect whether I addressed the box to myself or to Mr. Hubbard; they were to have been forwarded to Mr. Hubbard for me, and no one else. I don't recollect at the time the diamonds were left with Mr. Macfarlane whether Mr. Hubbard was in debt to me. He had owed me. I received the diamonds myself afterwards from Mr. Macfarlane. Mr. Hubbard did not know anything about the arrangement at the time. I never conveyed the diamonds to Hubbard. Before leaving for Japan I spent some time in San Francisco, and received more money from Mr. Hubbard, and whether I gave him my note or any other evidence of my indebtedness to him, I don't remember."

Cross-examination by defendant: "I presume the draft was paid by Mr. Hubbard, as it never was presented to me; it was my own draft endorsed by Mr. Macfarlane. I value the studs at $1,300, but I would not sell them at $1,500."

And likewise a letter (from defendant to plaintiff), which, as far as it concerns this case, is as follows:

"To business now—Chris. having been pushed for a little money on his departure, I have taken his draft on you for $575, and hold as security his diamonds, which are sealed up and addressed to you, and as soon as the draft is paid, I will forward the package to you through Wells, Fargo & Co.'s Express."

C. Van Dyck Hubbard *v.* Henry Macfarlane.

The defendant himself took the stand and testified that he never had any conversation with the plaintiff relative to diamonds. Christie told me that Hubbard was indebted to him, and he left the package with me. Hubbard never claimed the diamonds of me until the suit. I returned the diamonds to Christie.a year ago in January; John H. Paty, of Bishop & Co., stated that on the 11th of November, which is the day before the date of the letter above mentioned, he gave up to Christie, a mortgage of the plaintiff's in favor of Christie on some property in Oakland, California, which had been left at their bank (Bishop & Co.'s), as a collateral security for the payment of Christie's note of $1,500, which note had been paid by Christie. This ended the case, and counsel for plaintiff requested the Court to direct the jury that the letter above quoted was conclusive as evidence between the plaintiff and the defendant; that the diamonds were held by the defendant as a security for the plaintiff; which the Court refused to do, but instructed the jury that the letter was evidence for them to weigh.

To this refusal of the Court exception was taken.

Now it will be noticed that there is a variation between the complaint and the proofs adduced by the plaintiff himself. In his complaint he proceeds on the principle and on the allegation that the diamonds are the plaintiff's. In his motion for instructions to the jury, he avers that they were only held as a security to indemnify a draft of $575. In his opening to the jury he claims that he found from evidence taken this morning (that of Mr. Christie) that he could only claim $600, instead of the $2,500 alleged in the complaint,. and yet the letter, the subject of contemplation, says: " I have taken his (Christie's) draft on you for $575." Now, he could have discovered before that morning that he was only entitled to $600, unless he had altered his mind regarding the nature of the claim. It would appear as though, in the first place, he considered that he was entitled to the diamonds at any rate, or to

14

their full value, and afterward adopted the theory that he only was entitled to them as security for the payment of the draft; so it follows that the letter was not so conclusive to the mind of the plaintiff himself as to enable him to form the proper conclusions without testimony; and further still, there is no declaration made upon the draft whatsoever, and although at the trial it was admitted that the plaintiff had paid the draft, and it was not proved nor attempted to be proved, nor admitted that the plaintiff had been damnified by the payment of the draft, it was perfectly competent for defendant to try to prove that he paid it from funds in hand of Christie's. The words of the letter relied upon are these: "I have taken his draft on you for $575, and hold as security his diamonds, which are sealed up and addressed to you, and as soon as the draft is paid I will forward the package to you." Now, it will be observed that he does not say that he held them as security to plaintiff, and he offered to prove that the plaintiff did not regard it so; which he did, *first*, by the evidence of Mr. Christie, introduced by the plaintiff himself, in which he says they were left to secure Mr. Macfarlane, and that the diamonds were to be forwarded to Mr. Hubbard for me (Christie), and for no one else; and the defendant supports that evidence by showing that, at the time of writing the letter, the plaintiff owed Mr. Christie more than $1,500, and did not pay the draft relying on the diamonds; and, lastly, that though the draft was paid in due course, the plaintiff never called for the diamonds, but that they remained with the defendant until Mr. Christie returned here twenty-six months afterward, when they were delivered to him; and that, in point of fact, the plaintiff never demanded the diamonds or said anything about them to the defendant from the date of the letter, 12th November, 1874, to the date of the commencement of this suit, 15th December, 1877—more than three years. Now, therefore, inasmuch as the letter does not state that the defendant held the diamonds as security for Hubbard, it was for the

C. Van Dyck Hubbard *v.* Henry Macfarlane.

jury to determine what the force of the letter was, and whether the plaintiff had been misguided and had suffered loss by it in the payment of the draft; and it was right that they should weigh all the circumstances in order to arrive at a proper conclusion. So that the letter, as well as all the other evidence in the case, was properly left to the jury to consider.

The exceptions are overruled.

E. Preston, counsel for the plaintiff.

J. M. Davidson and Cecil Brown for the defendant.

### DISSENTING OPINION OF JUDD, J.

This is an action of trover to recover the sum of $2,500, the alleged value of some diamonds claimed to be the property of the plaintiff.

The bill of exceptions is as follows:

"It was admitted at the trial that the plaintiff could recover only for three diamond studs, and it was agreed that their value was $600, for which sum the plaintiff should take a verdict if the jury found in his favor.

"The plaintiff, as a part of his case, put in evidence a letter to him from the defendant, which is now on file, and other evidence was introduced by the plaintiff.

"The defendant also introduced evidence after the refusal of the Court to grant a nonsuit. The plaintiff requested the presiding Judge to direct the jury:

"That the letter (Exhibit A) is conclusive between the plaintiff and the defendant, that the diamonds were held by the defendant as security in favor of the plaintiff."

Which direction the Court declined to give in terms; but the jury were directed that the letter was evidence.

To which refusal to direct the jury the plaintiff duly excepted. The letter referred to is as follows:

"HONOLULU, November 12, 1874.

"MY DEAR HUBBARD: This steamer takes over our mutual friend Chris. (Mr. Christie). * * * To business now.

Chris. having been pushed for money on his departure, I have taken his draft on you for $575, and hold as security his diamonds, which are sealed up and addressed to you, and as soon as the draft is paid I will forward the package to you through Wells, Fargo & Co.'s Express.

"Faithfully yours,

"H. MACFARLANE."

It appears from the testimony that the plaintiff paid the draft; that the defendant kept the diamonds in Honolulu, and finally delivered them to Mr. Christie, shortly after his return to this Kingdom, about January, 1877. It is claimed, on the part of the plaintiff, that the defendant is precluded from showing that the subject matter of the action (the three diamond studs) was deposited with him for a different purpose than that stated in the letter above quoted, contending for the rule of law that "where one by his words or conduct willfully causes another to believe the existence of a state of things, and induce him to act on that belief so as to alter his previous position, the former is precluded from averring against the other a different state of things as existing at the same time." Pickard *vs.* Sears, 6 Ad. & El., 469.

This rule of law is not controverted by the defendant, but it is said (1), that the letter is not a statement sufficiently explicit and clear to induce plaintiff to believe that defendant held the diamonds as security for him (plaintiff); and (2), that the other facts in evidence rebut the idea that plaintiff acted upon the statement in the letter in paying the draft.

The essential ingredients of an estoppel by conduct or *in pais* are laid down as follows by this Court, in Kamohai *vs.* Kahele, 3 Haw. Rep., 530:

"In order to an estoppel by conduct, there must have been a representation, or concealment of material facts, known by the party to exist, and with the intention of inducing a party ignorant of the facts to act upon the representations."

The representation in this case was made by the party who

had endorsed the draft to the party on whom it was drawn. The representation made by defendant to plaintiff was: "I have taken his draft on you for $575, and hold as security his diamonds, which are sealed up and addressed to you, and as soon as the draft is paid I will forward the package to you through Wells, Fargo & Co.'s Express." It must be remembered that this was the letter advising the drawing of the draft, and was addressed to the person upon whom it was drawn, and who the defendant expected would pay it. Defendant says he held the diamonds as "security," not saying for whom, but in this connection they may fairly mean as security for himself, for his own endorsement of the draft. But why did he say that the diamonds were "sealed up and addressed to you" (the plaintiff), and that he would send them to him as soon as the draft was paid, unless to induce plaintiff to pay the draft, and thus relieve defendant of his endorsement? If the diamonds were to be sent to plaintiff merely as the friend of the owner, Christie, and to be passed over to him by the plaintiff, then the writer of the letter was bound so to represent it to the plaintiff.

The defendant knew the real facts of the case, and the plaintiff was ignorant of them, for from all that appears, the only knowledge he had of them was from the letter advising the draft.

It seems to me that facts so important to the drawer of a draft, that some diamonds were held by the person who had endorsed the draft—or "taken" it, as he says—sealed up and addressed to him, with a promise that he would forward them to him by express as soon as he paid the draft, were made, not as a mere item of intelligence without special significance, but with the *intention* that the plaintiff should act upon this information and pay the draft. But it is said that as the evidence shows that plaintiff had previously mortgaged some property in California to Mr. Christie, which mortgage had been used by him as collateral at the bank for a loan of $1,500,

this must be admitted as evidence to show that when plaintiff paid the draft he did so because he owed the amount of the mortgage to Mr. C., and was not induced to do so on the representation of Macfarlane that he would send the diamonds to him as soon as the draft was paid.

. But the mortgagor of land is not bound to honor the drafts of his mortgagee. We have no proof of the amount of the mortgage, or whether it was due, or especially whether plaintiff then knew that it was still in Christie's hands, so that he could be assured that the amount of the draft, if he paid it, would be endorsed as a payment on account of the mortgage.

We do not know whether Mr. Christie may not have drawn other drafts on plaintiff, and we have Mr. Christie's own statement that he did not remember (being extremely feeble from mortal disease) whether at the date of the draft Hubbard was owing him or not, but that he had owed him, and that when in San Francisco he had received more money from him.

It is certain that Macfarlane did not take the mortgage as security for his endorsement of the draft.

But as this letter of the defendant works an estoppel, it precludes him from showing a state of things inconsistent from those represented in the letter to be true. If it be true that Macfarlane held the diamonds merely for his own security, and it was intended that he should pass them over to Christie himself, or to Hubbard for Christie, he is precluded from showing it now, for if he made the representation to Hubbard, and Hubbard acted upon it, he must make it good, if he knew it to be false.

In Stonard *vs.* Denkin, 2 Campb. 344, the plaintiff gave in evidence an order from Knight to defendants, who are warehousemen, to hold the malt on the plaintiff's account, a written acknowledgment from the defendants that they held it on the plaintiff's account, and that he had advanced £7,500 to Knight, for which the malt was to be a security. Lord

C. Van Dyck Hubbard *v.* Henry Macfarlane.

Ellenborough said: "Whatever the rule may be between the buyer and seller, it is clear the defendants cannot say to the plaintiff, 'The malt is not yours,' after acknowledging to hold it on his account. By so doing, they attorned to him, and I should entirely overset the security of mercantile dealings were I now to suffer them to contest his title."

By a parity of reasoning, it is not now competent for Macfarlane to say that he did not intend to send the diamonds to Hubbard when he should pay the draft.

So, in Knight *vs.* Wiffen, 5 Law R. 2 B. 660, the defendant had stated to a station-master that a transfer of barley (his property) to a purchaser was "all right," and that he would deliver it when the station-master got the forwarding order, Lush, J., said: "I also think the plaintiff is entitled to judgment on this short and intelligible ground, supported by sound reason and all the authorities, that the defendant, by what he said to the station-master, assented to the transfer, and induced the plaintiff to believe that he would hold the barley to his order."

It is said, however, that Macfarlane did not *intend* Hubbard to act upon the representation in the letter that he had the diamonds sealed and addressed to him, and that he would send them to him when the draft was paid. But in Freeman *vs.* Cooke, 2 Exch. 654, Parke B., in commenting upon the rule in Pickard *vs.* Sears, says: "By the term willfully, however, in that rule, we must understand, if not that the party represents that to be true which he knows to be untrue, at least that he means his representation to be acted upon, and that it is acted upon accordingly; and if, whatever a man's real intention may be, he so conducted himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it, and did act upon it as true, the party making the representation would be equally precluded from contesting its truth."

It seems to me that a reasonable man would have been in-

C. Van Dyck Hubbard *v.* Henry Macfarlane.

duced to believe that the representation that the diamonds were in defendant's hands, sealed and addressed to plaintiff, and that they would be sent to him by express as soon as the draft was paid, was made with the intention that he should believe that the diamonds were to be sent in order that plaintiff might have them as security for his payment of the draft, and that it was intended that he should act upon this assurance and pay the draft.

Whether the acts or admissions shall operate by way of estoppel or not where the facts themselves are not controverted, is a matter of law for the Court to determine.

This estoppel, if created at all, was created by the letter, and its construction properly is a question of law for the Court. (See Kamohai *vs.* Kahele, above quoted, and Maning *vs.* Cogan, 49 N. H., 351.)

In my opinion, therefore, the presiding Justice should have charged the jury that the letter of defendant precluded him from showing that he held the diamonds for any other purpose than, first, as security for his own endorsement, and then as security for the drawer of the draft, the plaintiff. This would, of course, not prevent the introduction of evidence sustaining the defense of payment.

I think, too, that trover was the proper form for this action, for trover lies where the plaintiff has a special property in the chattel, and he may maintain it even against the general owner if he wrongfully deprives him of his possession. (3 Greenleaf on Evidence, Section 636 *et seq.*) Plaintiff had a right to the possession of the diamonds from defendant, in order that he might realize upon them to reimburse himself for paying the draft; and the passing them over to the owner, and not to plaintiff, was a conversion.

For these reasons I am obliged to dissent from the opinion of my learned brethren, and to hold that the exceptions should be sustained.